Good morning. May it please the court, my name is David Stradley. I'm here with John Bloss on behalf of the plaintiff's appellants in this matter. I come before you today to discuss two errors that the district court made. First, the court misapplied the Supreme Court's Reno v. Condon opinion using language that expressly dealt with Section 2721 of Section 2724, even though Congress used different language in those two sections. And secondly, and perhaps more primarily, the district court ignored the plain language of the statute in the absence of any showing that the plain language was either ambiguous or yielded an absurd result in this case. In other words, the district court interpreted a statute that was in need of no interpretation. Turning to the Reno issue first, the Reno case was the first time the DPPA went to the Supreme Court, and therein the question was whether the DPPA was a constitutional exercise of congressional power under the Congress. And the court there dealing with the case dealt with 2721, which was a restriction on what DMVs can do. That's what Section 2721 talks about. And the Supreme Court remarked that the DPPA in Section 2721 regulates what DMVs can do with information, the release of information held by state DMVs. But the court then went on to say that, quote, additionally, any person who obtains, discloses, or uses information from a state motor vehicle record for use other than specifically permitted by the DPPA may be subject to liability. In other words, the Supreme Court, like Congress, recognized a distinction between 2721 and 2724, and that is where the district court got confused. The district court held that the DPPA only regulates information in the state DMV, and that ruling defies both the language that Congress used and the structure of the DPPA. And further to suggest that the Supreme Court, the Supreme Court's choice of language, when the Supreme Court, like Congress, distinguished between information in the hands of a state DMV and information from a motor vehicle record, when they used different language, we owe them at least as much deference as we owe Congress that when they use different language, they mean different things. Are there any, counsel, are there any circuit courts that have adopted your view of the statute and said that it applies to something like a crash report or a driver's license or to records outside of the division of motor vehicles? A crash report, your honor, I don't believe has come before a circuit court, but information outside of the DMV has indeed come from before a circuit court in the Pickler decision. And in that decision, the information was gathered, the DPPA protected information was gathered from Westlaw and from other information brokers that were that were not directly from DMV. Certainly some cases have, the data has come directly from DMV as in the Marisich case from the Supreme Court. But in the Pickler case, the information did not come directly from the DMV. Why does that matter? Why does where the information comes from matter? That is what the district court, that's the distinction the district court employed, your honor, to dismiss our case. The district court says if it doesn't come directly from DMV, it's not protected by the DPPA. But the statute section 2724 specifically says that the DPPA protects information from a motor vehicle record and a motor vehicle record is defined. Well, does this does this come either directly or indirectly from the DMV? Yes, your honor. How does it how does it how is it traceable to the DMV, the information that that the defendants were, you say, violated the DPPA? Was that information that they obtained either directly or indirectly from a DMV? It is information that was certainly originated with the DMV, your honor. And the evidence in the record shows here that the information was obtained either from in the first instance, either from a driver's license or from the DMV's database that is established by affidavit as to each and every one of the plaintiff's appellants, that the information came from the driver's license or the DMV database, both of which are DMV records, was then placed on the crash report. And the crash report had a box checked that indicated that the information on the driver's license, i.e. was. So it seems to me the gist of what you're saying is that no matter how tenuous the relationship of the particular information is with respect to the DMV, that that's covered by this statute. Well, your honor, I would be willing to you're willing to let a very tenuous and indirect relationship with the DMV to bring the license or whatever within the coverage of the statute. Well, your honor, we would argue that it's not tenuous. It is certainly certainly did not come directly from DMV. But in this case, in this case, we have information that by statute in North Carolina, the drivers had to hand over at the accident scene. That is a that's a legal requirement. And that information was taken directly. Your honor, I'm sure. But in every in every instance, a driver's license is going to have some connection with the DMV because that's what you get mailed from the DMV. And it says, OK, fill this out. You have to maybe go into the DMV and take an eye exam or you the driver's license has something on it that has the expiration date and the expiration date is set by the DMV. But so but so every driver's license in the world has some attenuated, at least connection with DMV as a DMV ultimately issues the license. But does that does does that bring every driver's license in the country within the protection of the statute? Yes, your honor, at least in the first instance. And what do you mean the first instance? At least at least to begin with. Now, I just begin what to begin. I don't understand. Where's the get? What does that mean? Sure. Your honor, if I give away my if I go into a store and hand them my driver's license and give up my voluntarily give up my privacy, right, then perhaps my my DMV information is no longer protected because I gave it away. It's a statute designed to protect privacy. And I've given up my privacy voluntarily. Not what we're dealing with here. We're dealing with here an involuntary extraction of information from these North Carolina drivers, which is exactly what Congress intended to regulate here is this involuntary extraction with the DMV. No, that's not that's really not exactly what Congress intended to regulate, is it? Because Congress intended to regulate the abuse of these vast trove of information that exists within state DMVs. And the as a revenue raising mechanism. And when you read the combined the text with the legislative history, don't you get the idea that this was aimed at a particular particularly egregious misuse of privacy information, including driver's history, and medical information and all kinds of things. And they were using it to raise revenue. When you look at the history of this, and what gave it what brought the statute into being, it was that that was its focus. It's an anti commercialization statute in that sense. Isn't there all the difference in the world between using the information within a DMV to raise revenue and covering driver's licenses, which the individual who holds the driver's license is using it for all kinds of identification purposes. And Your Honor, there perhaps there is when the when the driver is using it for all kinds of identification purposes. That's not what it was used for here, here. But potentially it is, because every driver's license once it's issued, it is probably the most common means of identification in the country. I mean, people say, well, let me see your driver's license when you go to vote. Well, let me see your driver's license when you go to buy an intoxicating beverage. So something that is shown regularly for public inspection to all kinds of different people. Isn't that dramatically different from the misuse of records containing the most DMV? Are we talking about, you know, apples and oranges? Well, Your Honor, I would I would suggest that there certainly are distinctions. But the key distinction here, you mentioned commercial purposes. That is precisely what these these records were used for in this instance is, you know, harvested in bulk for commercial purposes, which is precisely what Congress was intending to regulate. And in terms of the question of whether Congress intended the driver's licenses to be covered, one only has to look at Section 2721E of the statute, which talks about the issuance of motor vehicle records by the DMV. And so it is, you know, the things that are issued by DMV are licenses, registrations, ID cards, the very kinds of things that we're saying are covered by the DMV. And 2721E says that that the DMV cannot condition the issuance of a motor vehicle record. Well, the appellees didn't get the information here from the driver's license. Excuse me, I'm sorry. The appellees did not get the information here from the driver's license, did they? That is correct. The appellees did not get the information from the driver's license. But again, a motor vehicle record is quite broadly defined as anything that pertains to a driver's permit. What is the limiting principle in what you're saying? That a motor vehicle record is anything that pertains to a driver's license ad infinitum? Well, Your Honor, in terms of the limiting principle that would apply to this case, the DPPA certainly protects information that is obtained involuntarily from a DMV database or a license, where the means of obtaining it show that the information is connected to the driver's license, as it did here. The crash report shows it is the same as the address on the driver's license. But following up on that point, I want you to focus on what that means, and obtained from. And it any of the things that you think are motor vehicle records? Well, Your Honor, there is a step removed, right? No, Your Honor, I would I would argue that it is that it doesn't matter how many steps removed it is. Did you look at the driver's license, the actual driver's license? No, they did not. Well, you didn't obtain it then from the driver's license, did you? Well, but the statute, the Congress in the statute indicates that that its intent is to regulate the consumption of these of this information downstream. Well, I had always thought that what we did was first look at the statutory language. And the statutory language says obtain personal information from a motor vehicle record, which would not some document that's made from the record, but from the record. And then after we look at the statutory language, then we look at intent. Well, Your Honor, I would suggest to you that if that is the if that is the rule, then the statute is readily can be readily circumvented. Because if that is the case, then a copy of the driver's license is unprotected. So, for example, when I go to the DMV, they could give me my license. They could make a copy of it before they give me my license. And then it is no longer protected because it is not from a motor vehicle record. The license would be the motor vehicle. And so it is clear from the structure of the statute, both the 2721 C, which talks about redisclosure of do not stop at the DMV door. This is a comprehensive scheme to regulate both the supply of DMV information. What language are you relying on that says it doesn't stop at the DMV? Well, Your Honor, if you look at Section 2721 C. I have a question here and one to what extent are crash reports and driver's licenses public records open to public inspection? Well, certainly under the terms of the DPPA, they are not. No, no, no. I'm saying as a matter generally, as a matter of state law, these records, be it a crash report or a driver's license, this would be a matter of state law. And to what degree are they open for public inspection to begin with? Your Honor, under state law in North Carolina, the crash reports are public records. However, the DPPA under the Supremacy Clause trumps state law. Well, I understand that, but we don't like we don't likely invoke preemption and everything unless it's a matter of congressional intent and congressional intent has to be has to be clear. And if we if we took your view, I'm wondering if we wouldn't be overruling a host of state laws that provide that crash reports and driver's licenses are open for public inspections, particularly crash reports. And the states do this as part and parcel of their police power to ensure public safety. Now, if we took your view of things, wouldn't we be overruling a host of state laws and wouldn't that be a loss in transparency? And having these things off balance to any kind of inquiry, that's a that's a very big step that you are taking in terms of transparency. And I'm wondering if there isn't some advantage to having these records open for public inspection. Well, Your Honor, there may be, but Congress has made the policy decision. Well, no, you're assuming the conclusion there. That's what we're trying to find out. Well, I don't think I am because because the whole point of the DPPA was to regulate state practices and to overrule state practices, state law. And that's what the question is. The matter is, it often is in law of one of degree. Yes, it was to overrule state practices. But the state practices that we are talking about are the ones that we have just gone over, which is the casual misuse of, as I say, a wealth of private information. That doesn't seem to me, the same danger doesn't seem to me present with respect to crash reports and driver's licenses. Driver's licenses don't have the driving history and they don't have medical information on the driver's license or on the crash reports. And and yet they would at DMV. I mean, you're talking about two with with DMV, all kinds of personal information that isn't present when you're talking about a driver's license. Well, your honor, the you are talking about some pretty sensitive information on a driver's license, for one thing, and certainly in the case of at least one of the plaintiffs here, Mr. Blakeslee, the report that was obtained contained his driver's license number, and that is certainly exposing him to some identity theft concerns. So, you know, I would I would argue that the the driver's license database is precisely and the information on driver's license licenses was precisely the information and the types of information that Congress intended to respect to restrict. Can you get back to Judge Montz's question that I don't think I heard an answer to it? Her question was, what language are you relying on that says the protection does not stop at the DMV? Sure. If you look at Section 2721C, your honor, I apologize for not getting that. If you look at 2721C, it says that an authorized recipient of personal information may resale or redisclose only for a permitted purpose. And so Congress has in mind here that once this information leaves the DMV door, that it is continuing to be regulated because it talks about the resale and redisclosure. And if the if the appellees are correct, 2721C goes out the window because there would be no reason to regulate resale or redisclosure if the only thing that was protected was information in the hands of DMV. So that section in and of itself shows that there's an intent to regulate beyond the doors of DMV. And when you couple that with Section 2722, which makes it unlawful to obtain the information without a permitted purpose in Section 2724, which creates this cause of action, the structure of the statute demonstrates that there was a clear intent by Congress to regulate outside of DMV's front door. Did your clients ever, I'm sorry, did your clients ever see an actual driver's license? Did my clients see a driver's license? My clients are the plaintiffs. So did anybody obtain a driver's license in this case? No one obtained a driver's license. Did anybody obtain anything else that you regard as a motor vehicle record? Yes, Your Honor. What? Information. No, no, no, I'm not talking about information. A tangible document. Yes. First of all, reading the statute that says obtained from a motor vehicle record. Yes. So from a motor vehicle record sounds like it's a tangible document, right? Right. Okay. So what information was obtained from a motor vehicle record directly? Our client's information was obtained from an accident report and an accident report is a motor vehicle record. Did you argue that below? We argued that the information on the accident report was information from a motor vehicle record. Well, but you waived the argument about, you know, we remember you briefing all through the sort of things changed as they do to be sure as you go along. But you never argued that finally, your final position. We argued that, we attempted to argue that on a motion to reconsider, Your Honor. Well, but that was not. So the fact that you attempted to argue it on a motion to reconsider is clear indication that it was not argued before. I think I have to concede that. Thank you. Okay. I'm sorry, did I interrupt you, Chief? No, I'm good. So, in sum, as my time is about up, where information is obtained from a document that shows it's connected to a motor vehicle record and that information has been involuntarily extracted from a plaintiff, the plaintiff should have a cause of action. All right. We thank you very much. And you have some rebuttal time that you reserved. And Mr. Learberg, we'd be pleased to hear from you, sir. Thank you, Your Honor. May it please the court, Matt Learberg for the Appellees. The plaintiffs today are asking for a lot. They're asking for this court to ignore a unanimous Supreme Court in its pronouncements in Reno versus Condon about the reach of the DPPA. The plaintiffs are asking this court to reject the statutory interpretation of virtually every other court in the country to consider the statute. They're asking the court to contravene the position of the Department of Justice as to what the DPPA means. And finally, they're asking this court to hold that the defendants violated federal law by obtaining and using public records that the government itself had already made public. I want to address. Suppose you could say, I suppose you could say that the plaintiff's position has a certain intuitive feel because a driver's license, it gives you a license to drive. And what are you driving? You're driving a motor vehicle. And so in that sense, the driver's license, which allows you to drive a motor vehicle, pertains to motor vehicle records. I mean, that's the intuitive appeal of it. Is it? Do you understand that? Yes, Your Honor. And there's two problems with that. First, most courts in the country have held that the driver's license itself in the hands of the driver is not itself a motor vehicle record because it does not pertain to itself. Is a record something that is kept by an institution, by an organization or the state? Is a record something that is kept on a continuing basis and an organized basis and consisting of a number of documents or files or whatever? Is that what we mean by a record? It is, Your Honor. The word record is not defined in the DPPA, but the DPPA was modeled. We go to the plain meaning of record. And I understand your argument to be that a record applies to something more extensive than simply a driver's license.  I mean, is that, I'm just trying to understand, is that the gist of what you're saying, that a record involves something more elaborate and something more systemic and something that doesn't involve simply a single individual or a single incident, but it involves either a state or it involves an organization of some sort that is creating records. And we talk about personnel records, for example, and those when we use the phrase, well, is it in a personnel record? We're talking about a file kept by the organization that includes more than one snapshot document. Yes, Your Honor. And the word record, that is the meaning of the word record under the Privacy Act on which the DPPA is modeled. In addition, that's what the Supreme Court unanimously said in Reno v. Condon. And the best that the plaintiffs can say about that opinion is that it's dicta or it's kind of ancillary as to what the Supreme Court is saying, speaking of the construction of the statute. The Privacy Act has different language. The Privacy Act says, makes an explicit textual limitation to records obtained, maintained by an agency. There's no language like that in the statute here. That's right, Your Honor. Well, then why did you change it? You left me with the impression that you thought that this was the same as the language in the Privacy Act, but that's not the case, is it? No, the connection with the Privacy Act is just that the word record is defined in that act and is undefined in the DPPA. Well, but that could lead to two conclusions, couldn't it? That either you're just doing it once or that the two are different. Right. In this case, though, the statute does that work by saying from a motor vehicle record as opposed to indirectly from or directly from. It just says from a motor vehicle record. And in fact, the statute was changed in committee. Judge Wilkinson noted a few years back in Anderson versus Hancock that one way that legislative history can be useful in a case like this is to trace words that were added or omitted from the statute in committee. Here, the key words in the House and Senate bill, the versions that came to committee, both would have expanded liability, kind of this downstream liability that the plaintiffs are asking for. But both of those bills were changed in the final version to make it clear that it must be obtained from a motor vehicle record. That change means something and it limits the reach of the statute. Well, one thing that, excuse me, Judge Moss, go ahead. I was just going to ask you, so taking that language, where in the definition of motor vehicle record does the statute say that is only records held by the DMV? That's right, Your Honor. It doesn't say in the definition of motor vehicle record. But because the word from, the work is done by the word from, as several of Your Honor's questions earlier kind of direct, it has to be from. I didn't think that was the argument you were making, but maybe it is. Maybe you and I are saying the same thing. Right. I mean, the information has to be from a motor vehicle record, and that has to mean direct. We know that based on. I didn't get it from the motor vehicle record, and you say that even if what the other side says is a motor vehicle record, is a motor vehicle record, assuming arguenda, they didn't obtain the information from the motor vehicle record because it was downstream. That's right. Even if a driver's license is a motor vehicle record, the plaintiff still can't win because my clients obtained publicly available accident reports that the state of North Carolina makes available for the public to view. So that when you talk about what the state of North Carolina makes available, if one of my concerns here is that if we adopted your opponent's view of this statute, we would be overturning a whole host of state laws which have historically made items such as this either to a greater or lesser extent available for public inspection. And you want to interpret preemption law with some caution and not just step into a situation where we're attributing to Congress a vast preemptive intent that at the very least doesn't seem to me to be clear and patent from the face of the statute. But can you elaborate on that as to what is the extent to which these licenses and crash reports are made available under state law for public inspection? And what are the reasons behind the state's wanting to make these items available? Yes, Your Honor. In North Carolina, accident reports themselves are public records from the moment they're created. And there's a reason for that. They are public records because it is in the public's interest to know if, for example, as in an earlier case with TV from 20 years ago, if the mayor is in a car accident, the public is entitled to know that and is entitled to pull that record and get those details. That's the public policy of North Carolina. Congress never intended for those state laws to be supplanted. This is a case and this is a statute that is similar to what the Supreme Court described in CTS versus Waldberg, where Congress has indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them. That is exactly what the DPPA does. And we know that because of the legislative history. We know it because of the B-1 and B-14 exceptions. B-14 specifically enshrines any system of state law and state law public records that relates to motor vehicle safety. Those are specifically incorporated into the DPPA and preserved. Accident reports are probably the paradigmatic example of something that the statute is clear on. They are specifically exempted from the definition of personal information in 2725. The B-1 exception specifically names law enforcement agencies and says that they are allowed to go forward and carry out their functions and use the information for that purpose. We know that accident reports were specifically contemplated. They're mentioned by name in the legislative history. They must be made available. So in interpreting preemption law, it always makes me a little bit more comfortable when you can come to a view that preserves the efficacy of the Supremacy Clause, which, and at the same time, preserves the state's interest in police power under a federal system. And here, the Supremacy Clause vindicates Congress's desire to protect against the worst abuses, which occurred in the commercialization of the statute or the commercialization of very private data. And at the same time, giving effect to the Supremacy Clause, and at the same time, respects the state laws that in many, many states view it as a matter of the public interest. So we're striking a balance here and saying, yeah, the Supremacy Clause indicates the desire to overrule state law to some degree, but it didn't just want to wipe off state laws off the board. You have a balance. That's exactly right, Your Honor. And one of the things that the plaintiffs raise is that somehow allowing a state law like North Carolina's would eviscerate the statute. But we know that's not true because case after case across the country, the DPPA has worked. It worked in Marisich where the lawyers went directly to the DMV. It worked in the Dysher v. City of Evansville case where a police officer obtained information from a DMV for his own use. That's a Seventh Circuit case. It worked in Dahlstrom where the paper went directly and tried to force the DMV to disclose information. The Kehoe case in the 11th Circuit, the Pickler case in the Eastern District of Pennsylvania. There's case after case where the DPPA works and plaintiffs win on summary judgment because there's just no dispute that somebody got the information directly from the DMV. Here, there's no dispute that the defendants didn't get the information directly from the DMV. Nobody contends that. And so this, in some sense, is just an open and shut case on that ground. The other thing that we know, Your Honor, is that Congress specifically contemplated the idea that other state agencies would need to use this personal information. We see that in the B-1 exception, which allows law enforcement agencies and other state agencies to use the personal information in the process of carrying out their functions. We also know that that wasn't Congress's intent. Because of that legislative history, Representative Edwards, who was involved in the final committee, said that there was simply no evidence before the subcommittee that other systems of public records are vulnerable to abuse in the same way that DMV records have been abused. If Congress wanted to regulate other regimes, other public records regimes, they could. If the state of North Carolina wanted to lock up certain personal information or require redactions of accident reports, they could. There's a range of things that could happen. They just didn't in this particular case. Is there anything further, sir? Yes, briefly, Your Honor. To the extent that the Reno v. Condon case is considered to have dicta in its construction of the DPPA, even then, this court typically follows Supreme Court dicta and doesn't need to parse whether the Supreme Court was, in a particular sentence, the holding or the dicta. An example of that is the NLRB v. Bluefield Hospital case, where a panel that included Judge Thacker said that we give great weight to Supreme Court dicta, as well as the recent Fusario case, which kind of gets into this question in a little more detail. Finally, in this case, we know that the statute couldn't possibly mean what the plaintiffs want because it would trigger a host of First Amendment problems. This court need not reach those First Amendment problems, but I want to touch on them briefly. We pose a couple of First Amendment challenges, but our core challenge is that if the plaintiffs are right, then our clients, as members of the public, are being punished by a civil-slash-criminal statute for obtaining and reading reports that the government itself chose to make public. And that really matters in this case because the DPPA includes several exceptions that allow, for example, insurance companies to contact drivers after an accident, but would specifically not allow law firms that could battle against those insurance companies to come forward and contact those same drivers. So, the sticky constitutional problems should be avoided, of course, under constitutional avoidance doctrines, and instead, the statute shouldn't be read in such a way to trigger those constitutional concerns, which is exactly the position that the Department of Justice takes as well. If there are no further questions, thank you for your time, Your Honor. We ask that the district court be affirmed. We thank you very much, and I think, Ms. Mundell, you have 10 minutes, and we'd be pleased to hear from you. Good morning, Your Honors. May it please the court, Amanda Mundell on behalf of the United States. A plaintiff's DPPA claim turns on defendants' use of information contained in accident reports, which are prepared by North Carolina law enforcement officers, made available under North Carolina's Public Records Act. The defendants have raised a First Amendment challenge to applying the act to these reports, but this court, like the district court, does not need to reach those arguments because obtaining or using police accident reports does not implicate the DPPA, and I would welcome the court's questions on any of those points. Maybe you can spell that out for me a little bit more. Certainly, Your Honor. So I think, as the court's questions have suggested, the defendants here obtained this personal information from a police accident report. They didn't obtain it from DMV records, and as I think everybody agrees, plaintiffs aren't arguing, or at least they hadn't argued below until motion for reconsideration, that those accident reports are actually motor vehicle records. So just under the plain terms of the statute, the DPPA doesn't apply to defendants' access or use of these accident reports. And as a result, we don't need to reach any of the sticky constitutional questions that defendants have highlighted. One thing, I've never been entirely clear as to whether the argument that the plaintiffs are making here pertains to motor vehicle licenses, driver's licenses, or whether it pertains to accident reports and crash reports, or whether they're arguing that in the alternative. I think, as one of my colleagues has brought up, the question of crash reports didn't make its appearance until the motion for reconsideration. And so is that a fairly clear instance, in your view, of sometimes waiver and forfeiture are confused? It seems to me a little bit more like I thought waiver involved a voluntary act or something, whereas forfeiture involved just missing a chance or an opportunity. Yes, Your Honor. Say more of an example of forfeiture to me, or failure to raise. Yes, Your Honor. And I think it'd be useful to go back to precisely where plaintiffs had made their arguments about what the classification of this information is, whether they're arguing the accident reports or whether it's driver's license. I believe, if you take a look at, and I apologize, I don't have the JA site, but it's the ECF number 67 from the Gary case. I think plaintiffs may have affirmatively disavowed arguing that accident reports are motor vehicle records under the statute, and that would be an instance of waiver. But if they hadn't done that, I think Your Honor's correct. That would be an instance of forfeiture, simply not to raise it. So this is interesting because you really have an instance of both waiver and forfeiture in your view. I think that's right, Your Honor. I'd have to go back to double check exactly what they said, but Your Honor's correct. Whether it's waiver or forfeiture, we agree that they didn't preserve that argument for appeal. They made it originally. A district court came out after the original argument was made and disavowed that, cast some cold water on that theory. And so they subsequently, I think directly, were no longer pursuing it, whether we call it waiver or whatever. Isn't that sort of what happened? Yes, Your Honor. That does refresh my memory. I think that's correct. At that point, they shifted their focus. They didn't pursue that argument anymore. Yeah. Seeing no additional questions, Your Honor, we'd simply ask that the court affirm. Thank you for your time. You're the expert on this statute across the United States. Do you argue other cases? No, Your Honor. This is my first DPPA case. So do you know whether there are other cases brewing? I've seen some district court cases. I don't know if those have been appealed. Appealed, yeah. So I can't speak to those, unfortunately. Okay. Any further questions? All right, we thank you very much. Mr. Stradley, you've reserved some time for rebuttal. Thank you, Your Honor. I'd like to address statutory. Well, I think first I'll start with Judge Wilkinson's question about the preemption situation. Congress has set the boundaries of preemption in Section 2721B, where it lists the 14 exceptions. And there is indeed a law enforcement exception, and there are 13 other exceptions there. But the Supreme Court has actually spoken on whether or not the deference to be accorded to state law here. And in Maricich, the argument was advanced that, well, doing these solicitations was perfectly permissible under the South Carolina State Bar Rules. And the Supreme Court says that the fact that an attorney complies with the State Bar Rules governing solicitation does not resolve whether he's entitled to access the DMV database. And the court, and this is a quote, even if such a provision existed under the Supremacy Clause, it would not protect respondents from DPPA liability unless their conduct fell within one of the exceptions. And so while I appreciate the preemption concerns, the fact of the matter is the Supreme Court has spoken and said that the law needs to be enforced as written. And if that preempts some state law practices, then that is simply the consequence of the Supremacy Clause and Congress enacting this law. Now, I want to turn back, though, to a question about the interpretation of the statute. And the appellants are advancing, excuse me, the appellees are advancing a view of the statute which I think adds language to the statute. While the statute does talk about information from a motor vehicle record, it does not say information directly from a motor vehicle record. Directly is not in the statute. It says from a motor vehicle record. And if you read the definition of motor vehicle record, it is, broad does not do it justice. It is expansive. Well, so what do you think is a motor vehicle record? I think a motor vehicle record is the same thing Congress said a motor vehicle record was. Well, just tell, instead of us arguing or discussing what Congress wanted, because people are divining what Congress's intention is. And as far as I know, we don't have them here with us. So why don't you just tell me what you think it is? Your Honor, I think it is, it is any record, anything that gets recorded that pertains to a driver's license registration or ID card issued by DMV. So what is the motor vehicle's record that you want in this case? Well, in this case, the information made its way from a driver's license or database to an accident report, which indicates that it is the same as the information on the license, and then to a spreadsheet which defendants compiled or which they had compiled. But you didn't get the information from a driver's license, right? They didn't get it directly from a driver's license. But they did get the information from a driver's license in sequence. Then going to the, getting, putting the information in the crash report, is that what you're saying? Yeah. Well, but the crash report, you've told us that you don't, that you don't make a claim with respect to it. So I don't know where we are. Sure, Your Honor. Where we are is the information makes its way from driver's license to report to spreadsheet that the defendants obtained. And those spreadsheets, because they contain information from a motor vehicle record back to the driver's license, those documents are motor vehicle records. And we have always argued. But doesn't the system from mean anything to you? You think it, like, I could say my family is from Ireland, which is true many generations ago. I think people would think I was lying if I said that my parents are from Ireland. You know, time goes by. Sure it does. But again, Congress did not say directly from. Congress said from. But it did say from. Absolutely, Your Honor. Did I understand you to say that the database that they created, that the appellants created, is a motor vehicle record under your theory? Because it pertains to information from the driver's license. There's no limit to your theory then. What is the limiting principle? Well, you know, as stated by at least one district court, once information is protected by the DPPA, it is protected throughout its travels. Has it been stated by any circuit court? It has not been stated directly by any circuit court. But the Pickler court certainly found that information that was gathered through Westlaw and information brokers, not directly from DMV, and not by the Judge Motz's definition of a document created by DMV. Those things cannot be, you know, Westlaw is, you know, if Westlaw is a motor vehicle record, then their spreadsheets are motor vehicle records. And that's what the Third Circuit found in the Pickler case. That that information was protected despite the fact it came not directly from DMV, but in sequence from DMV. Reno, you were talking about congressional intent. I had thought that Congress considered and rejected a version of the statute that says obtained information is derived from motor vehicle. Are you familiar with that? Motor vehicle record. I am familiar with that, Your Honor. Well, doesn't that throw a little cold water on your argument? Well, it does to some extent if the information is not, if you ignore the plain language of the statute. It doesn't say, again, that it says from. So you want to look at the legislative history when it helps you. But when it doesn't, you just want to look at the plain language of the statute. I'm happy looking just at the plain language of the statute, which talks about from. Your Honor, I don't think that I've made a lot of legislative history arguments. But the fact of the matter is, at least when I read the statute, and it says from, and I've got a Circuit Court opinion in Pickler showing that from does not mean directly from DMV. I've got Section 2721 showing that Congress clearly intended to regulate this information after it leaves DMV because it regulates resale or redisclosure of information. When I add all those things up, it says to me that Congress has an intention to regulate this information at least to the point that we're dealing with the kinds of information that Congress had in mind, i.e. information involuntarily extracted from drivers, which is exactly what happened here. By statute, they were required to hand over their driver's licenses. They were not given the option to not identify themselves for obvious reasons. And Congress specifically enacted the statute to regulate information which is extracted from driver's licenses, as the Court explains in Marist and Reno. I don't know that I disagree with you about driver's licenses. Maybe they are, maybe they're not. But you didn't obtain information from a driver's license. Your clients didn't. The defendants did not obtain information directly from a driver's license. They did obtain information that pertains to a driver's license, which is the definition that Congress adopted for a motor vehicle record. All right, thank you. We appreciate very much your argument. I'm sorry we can't come down and greet you personally. But thank you very much for your respective presentations. And I think we will go ahead and prepare to proceed into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Stephanie D. Thacker